1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

LINDA ANN LOWMAN,

                             Plaintiff,

    v.

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

                            Defendant.

Case No. 3:16-cv-00055-HDM-WGC

**REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE**

      This Report and Recommendation is made to the Honorable Howard D. McKibben, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4.

      Before the court is Plaintiff's Motion for Remand/Reversal. (Electronic Case Filing (ECF) No. 15.) The Commissioner filed a Cross-Motion to Affirm and Opposition to Plaintiff's Motion to Remand. (ECF Nos. 20, 21.)[1] Plaintiff filed a reply and response to the Commissioner's cross-motion. (ECF No. 22.)

      After a thorough review, the court recommends that Plaintiff's motion be granted; the Commissioner's motion be denied; and, that this matter be remanded for further proceedings consistent with this Report and Recommendation.

## I. BACKGROUND

      On December 15, 2011, Plaintiff filed applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, alleging disability commencing November 15, 2011.

---

[1] These documents are identical.

1    (Administrative Record (AR) 252-264.) The applications were denied initially and on

2    reconsideration. (AR 172-177, 184-89.) Plaintiff requested review before an Administrative Law

3    Judge (ALJ). (AR  196-97.)

4           On February 9, 2015, Plaintiff appeared, represented by counsel, and testified on her own

5    behalf before ALJ Eileen Burlison. (AR 49-96.) Testimony was also taken from a vocational expert

6    (VE). (AR 89-95.) On March 17, 2015, the ALJ issued a decision finding Plaintiff not disabled.

7    (AR 25-37.) Plaintiff requested review, and the Appeals Council denied the request, making the

8    ALJ's decision the final decision of the Commissioner. (AR 1-10, 19-21.) Plaintiff then

9    commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).

10           Plaintiff argues: (1) the ALJ erred in finding her mental impairments non-severe; (2) new

11    and material evidence submitted post-hearing warrants remand; and (3) the AJL improperly

12    discounted Plaintiff's pain and symptom testimony.

13                                    **II. STANDARD OF REVIEW**

14    **A. Substantial Evidence**

15           The court must affirm the ALJ's determination if it is based on proper legal standards and

16    the findings are supported by substantial evidence in the record. *Gutierrez v. Comm'r Soc. Sec.*

17    *Admin.*, 740 F.3d 519, 522 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)). "Substantial evidence is

18    'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

19    reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez*, 740 F.3d at 523-

20    24 (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

21           To determine whether substantial evidence exists, the court must look at the record as a

22    whole, considering both evidence that supports and undermines the ALJ's decision. *Gutierrez*, 740

23    F.3d at 524 (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The court "'may not

24    affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*,

25    759F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035

26    (9th Cir. 2007)). "'The ALJ is responsible for determining credibility, resolving conflicts in

27    medical testimony, and for resolving ambiguities.'" *Id*. (quoting *Andrews v. Shalala*, 53 F.3d 1035,

28    1039 (9th Cir. 1995)). "If the evidence can reasonably support either affirming or reversing, 'the

1   reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez*, 740

2   F.3d at 524 (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)). That being said, "a

3   decision supported by substantial evidence will still be set aside if the ALJ did not apply proper

4   legal standards." *Id*. (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir.

5   2009); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). In addition, the court will "review

6   only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ

7   on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010 (citing *Connett v. Barnhart*,

8   340 F.3d 871, 874 (9th Cir. 2003)).

9   **B. Five-Step Evaluation Process of Disability**

10        Under the Social Security Act, "disability" is the inability to engage "in any substantial

11   gainful activity by reason of any medically determinable physical or mental impairment which can

12   be expected to result in death or which has lasted or can be expected to last for a continuous period

13   of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant "shall be determined to be

14   under a disability only if his physical or mental impairment or impairments are of such severity

15   that he is not only unable to do his previous work but cannot, considering his age, education, and

16   work experience, engage in any other kind of substantial gainful work which exists in the national

17   economy, regardless of whether such work exists in the immediate area in which he lives, or

18   whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."

19   42 U.S.C. § 1382c(a)(3)(b).

20        The Commissioner has established a five-step sequential process for determining whether

21   a person is disabled. 20 C.F.R. § 404.1520 and § 416.920; *see also Bowen v. Yuckert*, 482 U.S.

22   137, 140-41 (1987). In the first step, the Commissioner determines whether the claimant is engaged

23   in "substantial gainful activity"; if so, a finding of nondisability is made and the claim is denied.

24   20 C.F.R. § 404.1520(a)(4)(i), (b); § 416.920(a)(4)(i); *Yuckert*, 482 U.S. at 140. If the claimant is

25   not engaged in substantial gainful activity, the Commissioner proceeds to step two.

26        The second step requires the Commissioner to determine whether the claimant's

27   impairment or combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c) and §

28   416.920(a)(4)(ii); *Yuckert*, 482 U.S. at 140-41. An impairment is severe if it significantly limits

1    the claimant's physical or mental ability to do basic work activities. *Id.*

2        In the third step, the Commissioner looks at a number of specific impairments listed in

3    20 C.F.R. Part 404, Subpart P, Appendix 1 (Listed Impairments) and determines whether the

4    impairment meets or is the equivalent of one of the Listed Impairments. 20 C.F.R.

5    § 404.1520(a)(4)(iii), (d) and § 416.920(a)(4)(iii), (c). The Commissioner presumes the Listed

6    Impairments are severe enough to preclude any gainful activity, regardless of age, education, or

7    work experience. 20 C.F.R. § 404.1525(a). If the claimant's impairment meets or equals one of the

8    Listed Impairments, and is of sufficient duration, the claimant is conclusively presumed disabled.

9    20 C.F.R. § 404.1520(a)(4)(iii), (d), § 416.920(d). If the claimant's impairment is severe, but does

10   not meet or equal one of the Listed Impairments, the Commissioner proceeds to step four. *Yuckert*,

11   482 U.S. at 141.

12       At step four, the Commissioner determines whether the claimant can still perform "past

13   relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f) and § 416.920(a)(4)(iv), (e), (f). Past

14   relevant work is that which a claimant performed in the last fifteen years, which lasted long enough

15   for him or her to learn to do it, and was substantial gainful activity. 20 C.F.R.

16   § 404.1565(a) and § 416.920(b)(1).

17       In making this determination, the Commissioner assesses the claimant's residual functional

18   capacity (RFC) and the physical and mental demands of the work previously performed. *See id.;*

19   20 C.F.R. § 404.1520(a)(4); *see also Berry v. Astrue*, 622 F.3d 1228, 1231 (9th Cir. 2010). RFC is

20   what the claimant can still do despite his or her limitations. 20 C.F.R. § 1545 and § 416.945. In

21   determining RFC, the Commissioner must assess all evidence, including the claimant's and others'

22   descriptions of limitation, and medical reports, to determine what capacity the claimant has for

23   work despite the impairments. 20 C.F.R. § 404.1545(a) and

24   § 416.945(a)(3).

25       A claimant can return to previous work if he or she can perform the "actual functional

26   demands and job duties of a particular past relevant job" or "[t]he functional demands and job

27   duties of the [past] occupation as generally required by employers throughout the national

28   economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (internal quotation marks and

citation omitted).

If the claimant can still do past relevant work, then he or she is not disabled for purposes of the Act. 20 C.F.R. § 404.1520(f) and § 416.920(f); *see also Berry*, 62 F.3d at 131 ("Generally, a claimant who is physically and mentally capable of performing past relevant work is not disabled, whether or not he could actually obtain employment.").

If, however, the claimant cannot perform past relevant work, the burden shifts to the Commissioner to establish at step five that the claimant can perform work available in the national economy. 20 C.F.R. § 404.1520(e) and § 416.290(e); *see also Yuckert*, 482 U.S. at 141-42, 144. This means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Gutierrez*, 740 F.3d at 528. If the claimant cannot do the work he or she did in the past, the Commissioner must consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can do other work. *Yuckert*, 482 U.S. at 141-42. The Commissioner may meet this burden either through the testimony of a vocational expert or by reference to the Grids. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).

"The grids are matrices of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Lockwood v. Comm'r of Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010) (internal quotation marks and citation omitted). The Grids place jobs into categories by their physical-exertional requirements, and there are three separate tables, one for each category: sedentary work, light work, and medium work. 20 C.F.R. Part 404, Subpart P, Appx. 2, § 200.00. The Grids take administrative notice of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels. *Id*. Each grid has various combinations of factors relevant to a claimant's ability to find work, including the claimant's age, education and work experience. *Id*. For each combination of factors, the Grids direct a finding of disabled or not disabled based on the number of jobs in the national economy in that category. *Id*.

If at step five the Commissioner establishes that the claimant can do other work which

exists in the national economy, then he or she is not disabled. 20 C.F.R. § 404.1566. Conversely, if the Commissioner determines the claimant unable to adjust to any other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(g); *see also Lockwood*, 616 F.3d at 1071; *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).

## III. DISCUSSION

**A. ALJ's Findings in this Case**

The ALJ found Plaintiff met the insured status requirements of the Social Security Act through June 30, 2013. (AR 27.)

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since her alleged onset date of November 15, 2011. (AR 27.)

At step two, the ALJ determined Plaintiff had the following severe impairments: multiple chemical sensitivities, status post back surgery with ongoing back pain, a history of adenomyosis, hypertension, underweight, a history of possible arthritis, and a history of migraines. (AR 27.) The ALJ found Plaintiff's mental impairments were not severe. (AR 27-28.)

At step three, the ALJ concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments. (AR 29.)

At step four, the ALJ assessed Plaintiff as having the RFC to perform less than the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b): she could lift/carry ten pounds frequently and twenty pounds occasionally; could sit, stand, and/or walk for six hours in an eight-hour work day; could do postural activities occasionally; and should avoid exposure to extremes of hot and cold, gasses, fumes, humidity and hazards such as unprotected heights and dangerous machinery. (AR 29.)

The ALJ then found, based on the VE's testimony, Plaintiff was capable of performing her past relevant work as an accounting clerk. (AR 35-36.)

Alternatively, at step five, the ALJ determined there were other jobs that exist in significant numbers in the national economy Plaintiff could perform. (AR 36.)

The ALJ concluded Plaintiff was not disabled. (AR 36.)

///

**B. Plaintiff's Mental Impairments**

Plaintiff contends that the ALJ erred in finding her mental impairments not severe at step two of the sequential analysis.

**1. Legal Standard**

A social security claimant must have a severe impairment or combination of impairments that significantly limits the physical or mental ability to do basic work activities. *See* 20 C.F.R. § § 404.1520(c), 416,920(c). If the ALJ finds the claimant has an impairment(s) that is severe, the ALJ will proceed to step three. An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities, which are defined as the abilities and aptitudes to do most jobs, such as: (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. *See* 20 C.F.R. § § 404.1521, 416.921. The claimant must prove the physical or mental impairment by providing medical evidence consisting of signs, symptoms and laboratory findings; the claimant's own statement of symptoms alone will not suffice. *See* 20 C.F.R. § § 404.1508, 416.908.

"A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its limiting effects on the individual's physical or mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself." SSR 85-28, 1985 WL 56856, at * 4 (1985). "An impairment or combination of impairments may be found 'not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting *Smolen*, 80 F.3d at 1290) (emphasis original in *Webb*); *see also* SSR 85-28, 1985 WL 56856, at * 3 (1985).  The step two inquiry is "a 'de minimis screening device [used] to dispose of groundless claims,' ... and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical

1   evidence.'" *Webb*, 433 F.3d at 687 (quoting *Smolen*, 80 F.3d at 1290).

2       Therefore, at step two the court's inquiry is whether the "ALJ had substantial evidence to

3   find that the medical evidence clearly established that [Plaintiff] did not have a medically severe

4   [mental] impairment[.]" *Webb*, 433 F.3d at 687 (citing *Yuckert*, 841 F.2d at 306).

5       In evaluating medical opinions, the court "'distinguish[es] among the opinions of three

6   types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine

7   but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat

8   the claimant (nonexamining physicians).'" *Id*. (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

9   1995)). Treating physicians' opinions are generally given more weight than examining or non-

10  examining physicians. *Id*. In addition, "the opinion of an examining physician is entitled to greater

11  weight than that of a non-examining physician." *Id*. (citing *Ryan*, 528 F.3d at 1198). "If a treating

12  physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic

13  techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will

14  be given] controlling weight." *Ghanim v. Colvin,* 763 F.3d 1154, 1160 (9th Cir. 2014) (citation

15  and quotation marks omitted). "The weight afforded a non-examining physician's testimony

16  depends on the degree to which [he or she] provide[s] supporting explanations for [his or her]

17  opinions." *Id*. (internal quotation marks omitted).

18      "'If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an

19  ALJ may only reject it by providing specific and legitimate reasons that are supported by

20  substantial evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1012. "[E]ven when contradicted, a

21  treating or examining physician's opinion is still owed deference and will often be 'entitled to the

22  greatest weight ... even if it does not meet the test for controlling weight.'" *Garrison,* 759 F.3d at

23  1012 (quoting *Orn v. Astrue,* 495 F.3d 625, 633 (9th Cir. 2007)).

24      The court will now review the ALJ's findings and the evidence in the record regarding

25  Plaintiff's mental impairments to determine whether or not the ALJ erred in finding Plaintiff's

26  mental impairments not severe at step two.

27  **2. The ALJ's Conclusions Re: Plaintiff's Mental Impairments**

28      The ALJ concluded that Plaintiff's mental impairments of depression and anxiety were

non-severe because they did not cause more than minimal limitation in her ability to perform basic mental work activities. (AR 28.) With respect to activities of daily living, the ALJ stated that Plaintiff had no limitation, pointing out that she did laundry, cleaned the house, fed pets, prepared meals, vacuumed, watered plants, dusted, washed sheets, cleaned the bath tub, washed the floors and went shopping. (AR 28.) The ALJ next indicated Plaintiff had no limitation in social functioning, stating that Plaintiff could maintain interaction with individuals in a variety of situations, noting that she lived with her daughter and grandchildren and talked on the phone with friends, and was able to testify on her own behalf and adhere to proper hearing decorum. (AR 28.) Regarding concentration, persistence or pace, the ALJ found Plaintiff had a mild limitation, with the ability to sustain focused attention and concentration long enough to permit the timely completion of tasks commonly found in a work setting. (AR 28.) The ALJ commented that during the hearing Plaintiff processed questions without difficulty, and responded appropriately without delay. (AR 28.) It was also noted that Plaintiff could drive and watch television, went out alone, would sew and ran errands. (AR 28.) Finally, the ALJ found Plaintiff had experienced no episodes of decompensation of extended duration. (AR 28.)

### 3. Plaintiff's Mental Health Records

The court agrees with Plaintiff that her medical records are replete with notations regarding her anxiety and mental difficulties, with her medical providers contradicting the ALJ's conclusions that Plaintiff's daily activities, social functioning and ability to concentrate were not limited by her impairments.

On November 16, 2011, Plaintiff had an episode of loss of consciousness and was described as being very anxious because aerosols kept being sprayed in her workplace and she continued to have confrontations with her supervisor. (AR 601.) Her doctor, Michelle J. Kiser, M.D., noted that emergency responders said on evaluation that they thought Plaintiff had a severe anxiety reaction. (AR 601.) Dr. Kiser stated that she felt Plaintiff should stop working because she could not handle the stress and depression. (AR 602.) She referred Plaintiff to psychiatry, noting that her therapist (Joann Behrman-Lippert, Ph.D.) had been very concerned about Plaintiff's anxiety and depression, and work issues which included confrontations with a supervisor.

1   (AR 602.) Dr. Kiser sent a letter to take Plaintiff off of work. (AR 602.)

2        On January 10, 2012, Dr. Kiser wrote a letter stating it was her opinion that Plaintiff was

3   overwhelmed by severe anxiety and depression; had difficulty completing tasks; and asked that

4   she be allowed sufficient time to complete forms and obtain paperwork. (AR 720, 748.) She stated

5   that Plaintiff developed significant medical illness due to anxiety and depression and severe

6   reactions from chemical exposure and was unable to work. (AR 699, 719.)

7        Dr. Matthew Parra wrote a letter on February 7, 2012, indicating he had been treating

8   Plaintiff since November 2011 regarding severe anxiety and worry surrounding her work

9   environment. (AR 747.) She had regular panic attacks and difficulty with concentration and

10  general functioning as a result. (AR 747.) Dr. Parra stated that this significantly interfered with her

11  ability to complete tasks needed for work as well as daily living. (AR 747.) He noted she was

12  undergoing treatment, but at that time she would have considerable difficulty returning to the work

13  environment. (AR 747, 832.)

14       On February 23, 2012, Plaintiff was assessed with severe anxiety and depression.

15  (AR 737.) She had panic attacks and did not like to be around people or in social situations. (AR

16  737.) She was described as having depression, anxiety, daily spontaneous tearfulness, mid-day

17  tiredness and inability to stay awake, and was overwhelmed. (AR 742.)

18       On March 6, 2012, Plaintiff reported her depression was at a level seven, and her anxiety

19  at a level ten, on a scale of one to ten. (AR 730.) She complained of poor energy, having

20  "meltdowns," waking twice a night and had difficulty getting back to sleep. (AR 730.) It was

21  discussed that she had a history of sexual assault from an intruder, and witnessed her daughter and

22  a friend being sexually assaulted. (AR 730.) She also had a history of physical and sexual abuse

23  from her second husband, who committed suicide by hanging himself. (AR 730, 732.) At that time,

24  she was described as angry and irritable, and reported symptoms congruent with depression and

25  anxiety which were improving with treatment. (AR 733.)

26       She went to the emergency room on March 19, 2012, and reported, *inter alia*, trouble

27  focusing. (AR 934.)

28       On April 9, 2012, Dr. Behrman-Lippert provided responses to inquiries regarding Plaintiff

to the State of Nevada Department of Business and Industry. (AR 668-670.) She indicated she had seen Plaintiff for twenty-four years regarding issues including forced entry into her apartment, sexual assault, marital issues, the death of her husband, sexual nuances in a past work environment, relationship struggles, long-term immune deficiency disorder and other medical problems. (AR 668.) In the end of 2010 and beginning of 2011, Plaintiff complained she did not feel well at work, had less energy, felt sick and depressed, had problems with concentration, and increased agitation and anxiety. (AR 668.) She brought up chemicals being sprayed at her workplace following a flood. (AR 668-69.) Dr. Behrman-Lippert's diagnoses included Post Traumatic Stress Disorder (PTSD), depressive reaction and general anxiety. (AR 669.) She noted that Plaintiff had taken anti-depressants and anti-anxiety medications for many years. (AR 669.) Dr. Behrman-Lippert stated that Plaintiff's mental condition had declined over the past year and a half. (AR 669.) She noted that in the late fall of 2011, Plaintiff became so depressed she experienced frequent crying, odd dreams, emotional labiality, problems with concentration and focus, increasing suspiciousness about the motivations of others, social withdrawal, mental confusion and multiple physical problems. (AR 669.) She was unable to function and saw Dr. Para for medication follow-up, who opined she was unable to work. (AR 669.) She required ongoing psychiatric care and psychotherapy to treat her severe depression and anxiety. (AR 670.)

On April 11, 2012, Dr. Kiser stated that Plaintiff was not doing better with depression and anxiety on her medications as she still woke with severe anxiety in the morning. (AR 827.)

On April 13, 2012, she was described as having severe anxiety and moderate to severe depression. (AR 74.)

On May 11, 2012, Plaintiff reported increased anxiety and depression and problems getting to sleep. (AR 773, 886.)

On May 25, 2012, State agency consultant Pastora Roldan, Ph.D., reviewed Plaintiff's records and determined she had medically determinable impairments of affective disorder and anxiety disorder. (AR 105.) She opined Plaintiff had mild restrictions of activities of daily living, mild difficulties maintaining social functioning, concentration, persistence or pace, and no repeated episodes of decompensation of extended duration. (AR 105.)

On May 30, 2012, Plaintiff said she was depressed, struggled to shower, lacked motivation, and had experienced poor sleep and weight loss. (AR 773, 885.)

On June 2, 2012, immunologist Dr. Alan S. Levin, opined Plaintiff was suffering from an organic altered mental state caused by her exposure to chemicals. (AR 786.)

On July 11, 2012, Plaintiff presented with a tight chest from anxiety, and reported two blackouts. (AR 884.) She indicated her anxiety was at level nine out of ten, she was depressed, cried a lot, and was overwhelmed and sad. (AR 884.) She was also having difficulty sleeping. (AR 884.)

On July 27, 2012, Dr. Kiser described her having severe anxiety. (AR 949, 951.)

On September 5, 2012, Plaintiff indicated her anxiety was at a level ten out of ten, with variable depression. (AR 883.)

On September 14, 2012, Plaintiff called to report her brother was found dead that day, and she presumed it was suicide like her former husband. (AR 882.) She was stressed and asked to be placed on anti-depressants. (AR 882.)

On November 2, 2012, she said her anxiety was not as bad, but she was still waking up at night and sleeping during the day. (AR 881.)

On December 14, 2012, Plaintiff was seen by Dr. Kiser for continued problems with anxiety. (AR 955.)

She presented to the emergency room on January 23, 2013, and it was noted, *inter alia*, that she had anxiety and should continue on Xanax. (AR 906.)

Plaintiff went to the emergency room on August 8, 2013, complaining of shortness of breath and anxiety. (AR 1244.)

On August 22, 2013, Dr. Kiser noted that her condition limited her ability to be around other people. (AR 1101.)

On October 4, 2013, she saw Dr. Kiser and was described as having moderate depression, considerable anxiety and insomnia. (AR 1098, 1099.)

On December 15, 2013, Dr. Kiser wrote a letter to Senator Harry Reid concerning Plaintiff's chemical exposure and multiple chemical sensitivity disorder, and her opinion that

1   Plaintiff was medically unable to work in a setting with other people due to her medical condition

2   and chronic anxiety. (AR 528.) She went on to state that Plaintiff's depression and anxiety had

3   several causes, but were worsened by her inability to interact and work. (AR 528.) She noted that

4   Plaintiff had been treated for her anxiety with only limited success. (AR 528.)

5          On January 15, 2014, State agency consultant R. Torigoe, Ph.D., found there was

6   insufficient medical evidence to assess the effects of Plaintiff's mental impairments. (AR 141-42.)

7          Sheila Bastien, Ph.D., submitted a neuropsychological report dated January 27, 2014

8   concerning an evaluation of Plaintiff on December 27, 2013. (AR 1146-1158.) Plaintiff appeared

9   for the evaluation anxious and somewhat depressed, and easily distracted. (AR 1148.) She scored

10  in the low average range of intellectual functioning on the Wechsler Adult Intelligence Scale. (AR

11  1148.) She scored in the average range in verbal comprehension, but in the low average range in

12  the other WAIS-IV subtests.   (AR 1149.) Dr. Bastien opined that overall this test indicated

13  deterioration in intellectual functioning. (AR 1150.)

14         Plaintiff was in the severe range of impairment for speed of processing and ability to scan

15  and shift. (AR 1151.) She scored in the severe range of brain dysfunction for the Halstead Category

16  Test which measures abstraction and reasoning abilities. (AR 1151.) Her ability to recall contextual

17  verbal material was also in the severe range of impairment. (AR 1153.) Her ability to initially

18  remember spatial configurations was in the mild to moderate range of impairment. (AR 1153.) Her

19  performance on the Thurstone Verbal Fluency Test was very poor. (AR 1154.) On the Differential

20  Aptitude Test (DAT), which examines eight ability areas most significant for any particular

21  occupation (and is keyed to the Dictionary of Occupational Titles), she scored "too low to perform

22  previous work effectively." (AR 1154.) In fact, she scored too low to "function in any job in the

23  national economy." (AR 1156.) She scored in the first percentile in numerical ability on that test,

24  which indicated an extreme impairment. (AR 1154.)

25         Her score on the Beck Depression Inventory II (BDI-II) test indicated severe depression.

26  (AR 1155.) Dr. Bastien opined Plaintiff had unexpected cognitive difficulties, and her testing

27  indicated significant problems with memory. (AR 1156.) In sum, Dr. Bastien concluded Plaintiff

28  was severely impaired and could not handle the cognitive demands of work in any occupation on

a consistent and predictable basis. (AR 1156.) Dr. Bastien further opined that Plaintiff met Social Security Listed Impairment 12.02 Organic Mental Disorders which resulted in marked restriction in daily activities, marked difficulties maintaining social functioning (as she had become socially isolated and withdrawn), deficiencies in concentration, persistence and pace (unable to complete tasks in a timely manner because of confusion and concentration problems), and was likely to have repeated episodes of deterioration and decompensation in work settings as she could no longer calculate an adequate way to perform her work. (AR 1157-58.)

On May 16, 2014, Plaintiff indicated that she had trouble sleeping and would awaken with anxiety. (AR 1214.)

On August 27, 2014, she reported increased anxiety and panic attacks. (AR 1207.)

On November 20, 2014, Dr. Anita Kedia examined Plaintiff for complaints of chest pain and concluded that the pain was most likely related to her anxiety and chronic pain syndrome. (AR 1173.) On November 25, 2014, anxiety was listed as an active problem. (AR 1183.)

On December 1, 2014, Valerie Leitko, PA-C, wrote a letter stating that Plaintiff was unable to sit in a room with other people to attend bankruptcy class, and it was medically necessary for her to have a separate room where she could bring her air purifier. (AR 1225.)

She was seen for a follow up concerning her depression on January 26, 2015. (AR 1331.) Her anxiety was described as uncontrolled. (AR 1332.) She refused medication, with a mention that she was fearful she would have a reaction. (AR 1331-32.)

On January 27, 2015, Dr. Kiser filled out a treating physician questionnaire. (AR 1311-1313.) She has seen Plaintiff three to five times a year since 1997, and diagnosed her with multiple chemical sensitivity syndrome, migraines, macular hole, anxiety, hypertension and depression. (AR 1311.) She described Plaintiff's prognosis as poor and her problems as permanent. (AR 1311.) She indicated Plaintiff was not a malingerer. (AR 1311.) She stated that emotional factors did contribute to the severity of her symptoms and functional limitations. (AR 1311.) She opined that Plaintiff's symptoms would constantly be severe enough to interfere with the attention and concentration needed to perform even simple work tasks. (AR 1312.)

Plaintiff saw her physician, Dr. Michael Owens on February 11, 2015. (AR 1420.) He

1    described her as having "interesting psychiatric presentations." (AR 1420.)

2         On February 26, 2015, Dr. Owens noted that Plaintiff refused most medications out of fear

3    they would exacerbate her condition; she saw a psychologist once a week; and brought a personal

4    air filter with her. (AR1418.) Her anxiety was considered elevated and she was tearful at the visit.

5    (AR 1419.) Her physician planned to contact her therapist about her fears. (AR 1419.)

6         Dr. Behrman-Lippert provided a statement on May 7, 2015, indicating she had seen

7    Plaintiff on and off for twenty years. (AR 1422-23.) Plaintiff was in therapy after being a victim

8    of a violent crime, to address problems in her marriage and then her husband's suicide,

9    occupational exposure to chemicals. She had problems with concentration, tearfulness, depression,

10   anxiety, was suspicious and hypervigilant. (AR 1422.) Dr. Behrman-Lipper's diagnoses included

11   PTSD, major depression, generalized anxiety with panic, and mixed personality disorder. (AR

12   1422-23.) She indicated that Plaintiff's psychiatric condition had become more severe over the

13   past four to five years, as she had problems with concentration, focus, severe anxiety, physical

14   reactivity to being exposed to chemicals in a multitude of settings including stores, the workplace,

15   hospitals, and doctors' offices. (AR 1422.) She had mood swings with intense anxiety and major

16   depressive symptoms, suspiciousness, hypervigilance, and feelings of hopelessness. (AR 1422.)

17   In her office appointments she was emotionally agitated, tearful, irritable, with pressured speech

18   and a low frustration tolerance. (AR 1422-23.) She had an inability to regulate her emotions,

19   compromised cognitive functioning, was socially isolated and withdrawn from everyone except

20   her children. (AR 1423.) She also had breakdowns in public. (AR 1423.) Based on the foregoing,

21   Dr. Behrman-Lippert opined Plaintiff was incapable of maintaining the cognitive focus or

22   emotional stability to work. (AR 1423.) She also noted that medication had not been beneficial in

23   the past. (AR 1423.)

24        **4. Analysis**

25        The court find's the ALJ's conclusion that Plaintiff's mental impairments were not severe

26   at step two is unsupported by substantial evidence in the record. The ALJ's statements that Plaintiff

27   had no limitations in terms of daily activities or social functioning, was only mildly limited in

28   terms of concentration and would have no episodes of decompensation are not consistent with the

conclusions of her long-term treating physician and therapist, and psychiatric evaluation.

Plaintiff's anxiety and depression, which were consistently described by her treating health care providers as significant or severe, were continually discussed by her treating medical providers. At the end of 2011 and beginning of 2012, her treating physician, Dr. Kiser, opined that Plaintiff was unable to work due to anxiety and depression. Her anxiety was discussed by Dr. Para, who described her as experiencing panic attacks and difficulty concentrating which he found "significantly" interfered with her ability to complete tasks needed for work *as well as* activities of daily living. In February of 2012, it was indicated that she had panic attacks, and difficulty being around others and with social situations. She was often reported as having trouble focusing and concentrating. She was described as unable to interact with others at work, socially isolated and withdrawn from everyone but her children.

When her mental condition was assessed by Dr. Bastien, the results were dismal, and consistent with what had been reported by Plaintiff's treating providers. The testing confirmed cognitive difficulties, problems with memory and marked restrictions in daily activities and social functioning. In contradiction to the ALJ's findings, Dr. Bastien opined Plaintiff would have repeated episodes of deterioration and decompensation in the work setting.

> With respect to the opinion evidence, the ALJ stated the following:
> The reports of M. Kiser, M.D., M. Parra M.D., P. Ranheim, M.D., J. Behrman-Lippert, Ph.D., A. Levin, M.D., and S. Bastien, Ph.D., were prepared in the context of the adversarial workers' compensation claim system. … Medical reports generated in the context of a workers' compensation claim are adversarial in nature. The physicians retained by either party in the context of workers' compensation cases are often biased and do not provide truly objective opinions. The claimant's treating physician in the context of a workers' compensation claim often serves as an advocate for the claimant and describes excessive limitations to enhance the claimant's financial recovery. In addition, the definition of disability in a workers' compensation case is not the same as in a Social Security disability case. Workers' compensation cases look only at the claimant's ability to return to the job being performed at the time of the injury. Finally, whether the claimant is "disabled" is a determination reserved to the Commissioner. Therefore, the credibility and relevance of the opinions of Dr. Kiser, Dr. Parra, Dr. Ranheim, Dr. Behrman-Lippert, Dr. Levin, and Dr. Bastien must be carefully assessed because of the involvement with the workers' compensation claim.

(AR 33.)

The court generally agrees with Plaintiff that the ALJ failed to appropriately consider all

of these doctors' opinions together.

Moreover, the ALJ provided no explanation as to how any of the doctors in this instance were in fact biased or described excessive limitations. Instead, the opinion letters from Dr. Kiser and Dr. Behrman-Lippert, who were her treating physicians with respect to her mental health care, were consistent with their treatment notes. While a worker's compensation case may only look at the ability to return to the job being performed at the time of injury, the treating providers' opinions regarding Plaintiff's mental health condition at that time, and as reflected in their treatment notes, are certainly relevant and should not have been collectively disregarded because of the context in which some of the opinions were rendered. *See Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995) (citing *Ratto v. Secretary,* 839 F.Supp. 1415 (D. Or. 1993)) ("'The Secretary may not assume that doctors routinely lie in order to help their patients collect disability payments.'" "While the Secretary 'may introduce evidence of actual improprieties,' no such evidence exists here."). Additionally, the ALJ ignored that Dr. Bastien did in fact refer to Social Security disability listings in her report.

The ALJ went on to state that she gave little weight to the opinions of all of these doctors. (AR 33.) Referring to the doctors collectively, ALJ Burlison stated that they "relied quite heavily on the claimant's subjective report of symptoms and limitations." (AR 33.) This does not address the findings of any one particular doctor, and in any event ignores the fact that in the context of mental health the provider must rely to a significant degree on the claimant's subjective reporting of symptoms and limitations. In addition, the ALJ failed to mention that Dr. Bastien *did* rely on objective testing in her assessment of Plaintiff.

Next, the ALJ indicated that the doctors' (again, collectively) treatment visits were relatively infrequent, and as such the treatment relationships did not last long enough for the doctor to have obtained a longitudinal picture of Plaintiff's condition. (AR 34.) The most significant reporting of Plaintiff's mental status came from her treating physician, Dr. Kiser, and her treating therapist, Dr. Behrman-Lippert. Dr. Kiser stated that she saw Plaintiff three to five times a year since 1997, which is a significant treatment relationship in the court's estimation. Dr. Behrman-Lippert stated that she had seen Plaintiff on and off for mental health issues for over twenty years,

which also demonstrates a long-term treatment relationship. Contrary to the ALJ's assertion, these treatment relationships would certainly give these providers a "longitudinal picture" of Plaintiff's mental health condition. As Plaintiff points out, the ALJ's finding in this regard is not only unsupported by the record with respect to these providers, but is further called into question by the fact that the ALJ subsequently assigned "great weight" to the opinions of the State agency psychiatric consultant who *never* examined or treated Plaintiff and merely reviewed Plaintiff's records. (*See* AR 35.)

The ALJ went on to state, without elaboration, that the course of treatment of the doctors (again, collectively) "has not been consistent with what one would expect if the claimant were truly disabled." (AR 34.) The ALJ does not state what treatment would be expected of an individual who suffered from anxiety and depression, and ignores the fact that Plaintiff treated on and off with her therapist for over twenty years.

While the ALJ found Plaintiff could perform some daily activities at home, the ALJ did not discuss Plaintiff's abilities to function in the workplace, particularly when her medical providers consistently described her as having difficulty in this regard. Moreover, as will be discussed below in connection with Plaintiff's credibility, the ALJ cherry-picked portions of Plaintiff's functional reports and left out qualifiers that rendered her activities consistent with her asserted limitations.

The ALJ also found Plaintiff had no limits in her ability to function socially, citing her ability to interact with her children, but this ignores her health providers' reports of her difficulties functioning in public, and in the workplace in particular.

The Commissioner argues that even if the ALJ erred in finding Plaintiff's mental impairments not severe at step two, the error is harmless because the ALJ continued through the five-step evaluation and considered the effects of the non-severe impairments on Plaintiff's functional abilities. (ECF Nos. 20/21 at 5-6.) This may be true generally, but as discussed above, the ALJ's consideration of the mental health evidence is rife with errors. For instance, the ALJ's conclusions concerning the evidence are unsupported by the record, and the ALJ erred in failing to set forth specific and legitimate reasons for rejecting the opinions of Plaintiff's treating and

1    examining physicians that are supported by substantial evidence in the record.

2         In sum, the court concludes that the ALJ erred in finding Plaintiff's mental impairments

3    non-severe at step two, and remand is warranted.

4    **C. New Evidence**

5         Plaintiff indicates that she was involved in a motor vehicle accident on March 3, 2015, and

6    Dr. Owens completed a DMV application on her behalf, stating she cannot walk 200 feet without

7    stopping to rest, is severely limited in her ability to walk due to an arthritic, neurological, or

8    orthopedic condition, and is visually handicapped. He also noted that Plaintiff has allergic

9    reactions to airborne poisons and multiple psychiatric issues including anxiety. (AR 1382.)

10        She treated for pain in her left arm and shoulder on March 16, 2015, and a CT scan of the

11   cervical spine resulted in a diagnoses of acute right mid and lower cervical radiculopathy. AR 1385

12        This evidence was considered by the Appeals Council and made part of the record. The

13   ALJ rendered the decision in the case after the accident and follow-up CT scan. The ALJ did not

14   consider the cervical spine impairments as severe because the evidence was unavailable at the time

15   of the decision. Thus, Plaintiff asks the court to remand for further consideration of this evidence.

16        The Commissioner argues that Plaintiff does not explain how the evidence that Plaintiff

17   asks to be considered (a March 16, 2015 treatment record for left arm and shoulder pain and the

18   results of a CT scan of the cervical spine of the same date) proves limitations beyond those

19   contained in her RFC.

20        The Commissioner also states that the ALJ did consider an MRI of Plaintiff's back taken

21   on January 29, 2015, and determined that the findings were consistent with the assessed RFC.

22        The Appeals Council considered and made this new evidence a part of the record.

23   (*See* AR 5.) Therefore, the court concludes that the ALJ should consider the evidence and any

24   further impact it may have on Plaintiff's functional capabilities on remand.

25   **D. Plaintiff's Pain and Symptom Testimony**

26        Lastly, Plaintiff argues that the ALJ improperly discounted her pain and symptom

27   testimony. (ECF No. 15 at 27-30.)

28        "[A] claimant's credibility becomes important at the stage where the ALJ is assessing

1    residual functional capacity, because the claimant's subjective statements may tell of greater

2    limitations than can medical evidence alone." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir.

3    2001) (citing SSR 96-7p (1996)).  Thus, a claimant's credibility is often crucial to a finding of

4    disability.  The ALJ is responsible for determining credibility.  *Meanel v. Apfel*, 172 F.3d 1111,

5    1113 (9th Cir.  1999); *Magallanes*, 881 F.2d at 750; *see also Lingenfelter v. Astrue*, 504 F.3d 1028,

6    1035-36 (9th Cir.  2007).

7          In general, when deciding to accept or reject a claimant's subjective symptom testimony,

8    an ALJ must engage in two steps: an analysis under *Cotton v. Bowen*, 799 F.2d 1403 (9th Cir.

9    1986) (the "*Cotton* test"), and an analysis of the credibility of the claimant's testimony regarding

10    the severity of his or her symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir.  1996);

11    *see also* 20 C.F.R. § 404.1529 (adopting two-part test).

12          First, under the *Cotton* test, a claimant who alleges disability based on subjective symptoms

13    "must produce objective evidence of an underlying impairment 'which could reasonably be

14    expected to produce pain or other symptoms alleged.'" *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th

15    Cir.  1991) (en banc) (citing 42 U.S.C. § 423(d)(5)(A)); *see also  Berry v.  Astrue*, 622 F.3d 1228,

16    1234 (9th Cir. 2010)*; Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The test

17    "imposes only two requirements on the claimant: (1) [he or] she must produce objective medical

18    evidence of an impairment or impairments; and (2) [he or] she must show that the impairment or

19    combination of impairments *could reasonably be expected to* (not that it did in fact) produce some

20    degree of symptom." *Smolen*, 80 F.3d at 1282 (emphasis original); *see also* 20 C.F.R. §

21    404.1529(a)-(b).

22          "Second, if the claimant meets the first test, and there is no evidence of malingering, the

23    ALJ can reject the claimant's testimony about the severity of her symptoms only by offering

24    specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036 (internal

25    quotation marks and citation omitted); *see also Brown-Hunter v. Colvin*, 806 F.3d 487, 488-89

26    (9th Cir. 2015). "This is not an easy requirement to meet: 'The clear and convincing standard is the

27    most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015

28    (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). The Ninth

1 Circuit has explicitly rejected the government's argument that the clear and convincing standard

2 does not apply (ECF No. 16 at 6:1-7) twice in the last two years. *See Brown-Hunter v. Colvin,* 806

3 F.3d 487, 493 (9th Cir. 2015); *Burrell v. Colvin,* 775 F.3d 1133, 1137 (9th Cir. 2014). To be clear,

4 the ALJ must "specify which testimony she finds not credible, and then provide clear and

5 convincing reasons, supported by evidence in the record, to support that credibility determination."

6 *Brown-Hunter,* 806 F.3d at 489. The failure to do so "precludes [the court] from conducting a

7 meaningful review of the ALJ's reasoning." *Id*.

8   An ALJ's credibility findings are entitled to deference if they are supported by substantial

9 evidence and are "sufficiently specific to allow a reviewing court to conclude the adjudicator

10 rejected the claimant's testimony on permissible grounds and did not 'arbitrarily discredit a

11 claimant's [symptom] testimony.'" *Bunnell,* 947 F.2d at 345 (quoting *Elam v. Railroad Retirement*

12 *Bd*., 921 F.2d 1210, 1215 (11th Cir. 1991)). "General findings are insufficient; rather, the ALJ

13 must identify what testimony is not credible and what evidence undermines the claimant's

14 complaints." *Berry*, 622 F.3d at 1234 (internal quotation marks and citation omitted).

15   An ALJ may consider various factors in assessing the credibility of the allegedly disabling

16 subjective symptoms, including: daily activities; the location, duration, frequency, and intensity of

17 pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and

18 side effects of any medication taken to alleviate symptoms; treatment, other than medication,

19 received for relief of symptoms; any measures a claimant has used to relieve symptoms; and other

20 factors concerning functional limitations and restrictions due to symptoms. 20 C.F.R. §

21 404.1529(c)(3)(i)-(vii).

22   When analyzing credibility, an ALJ may properly consider medical evidence in the

23 analysis; however, the ALJ may not reject subjective pain testimony "on the sole ground that it is

24 not fully corroborated by objective medical evidence[.]" *Rollins v. Massanari*, 261 F.3d 853, 857

25 (9th Cir. 2001); *see also Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1196 (9th Cir. 2004)

26 (holding ALJ properly determined credibility where claimant's testimony was contradictory to and

27 unsupported by objective medical evidence).

28   The ALJ noted that Plaintiff alleged disability due to heart problems, immune deficiency,

1    back problems, mental problems, chemical problems, and that she is blind in her left eye, has pain

2    and burning that goes down the right leg and into her foot and toes on the right side, and had back

3    surgery in 2012. (AR 30.) In addition, Plaintiff reported that she had anxiety every time she got in

4    her car because she knew she would get sick, and had anxiety in crowds. (AR 30.)

5           The ALJ found Plaintiff's impairments could reasonably be expected to cause the alleged

6    symptoms, but that the statements concerning the intensity, persistence and limiting effects of the

7    symptoms were not entirely credible. (AR 31.) There was no mention of Plaintiff malingering;

8    therefore, the court must determine whether the ALJ articulated clear and convincing reasons for

9    discounting Plaintiff's credibility.

10          The ALJ first found Plaintiff's symptom and pain statements less than credible because she

11   "engaged in a somewhat normal level of daily activity." (AR 30.) The ALJ cited that she lived

12   with her daughter and grandchildren, she drove, talked on the phone with friends, watched

13   television, and did dishes. (AR 30.) The ALJ also mentioned function reports where Plaintiff stated

14   that she did laundry, cleaned the house, fed the pets, prepared meals, made calls, vacuumed,

15   watered the plants, dusted, washed sheets, cleaned the bath tub, washed the floors, went out alone,

16   went shopping, and would sew and run errands. (AR 30.)

17          Plaintiff is correct that the function statements also indicated that when she woke up, she

18   cried for two hours before she got out of bed, and she would go back to bed after doing the dishes,

19   laundry and cleaning up. (AR 295.) While she prepared meals, she stated that she would fix easy

20   meals in ten minutes. (AR 295, 296.) While she may have lived with her daughter and

21   grandchildren, she indicated that in the past year she was unable to take care of anyone else. (AR

22   295.) When she did engage with them, it would consist of playing on the bed and watching movies,

23   which she described as "quiet stay at home things." (AR 295.) While she stated she cared for pets,

24   she qualified this response with the fact that she did so with the help of her daughter and

25   grandchildren. (AR 295.) She indicated that did not feel social and had anxiety and wanted to be

26   left alone except for people she has known for years. (AR 297.) She went out alone if she had to,

27   but tried not to go if no one was available to go with her. (AR 297.) While she stated that she

28   drove, she cited worry about her health condition and her eye sight. (AR 297.) While she shopped,

1   she did so with her daughter or sister. (AR 297.) She cited issues paying the bills. (AR 297.) She

2   spent time with others, but described it as involving only her daughter and sister. (AR 298.)

3       The court finds that substantial evidence does not support the ALJ's determination that

4   there is a conflict between Plaintiff's reported daily activities and her reported pain and symptom

5   limitations. While the ALJ pointed to Plaintiff's various statements concerning her activities, she

6   included no discussion about how these statements contradicted her allegations of disability.

7   Moreover, almost all of the daily activities cited by the ALJ were qualified by Plaintiff such that

8   they are in fact consistent with her reported limitations. *See Burrell v. Colvin*, 775 F.3d 1133, 1138

9   (9th Cir. 2014); *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (citations omitted) ("Only if

10  [the] level of activity [is] inconsistent with [a claimant's] claimed limitations would the[] activities

11  have any bearing on [the claimant's] credibility.").

12      The ALJ also found that Plaintiff received routine, conservative, and non-emergency

13  treatment since the alleged onset date. (AR 31.) Plaintiff is correct that this ignores Plaintiff's many

14  trips to the emergency room for shortness of breath and chest pain and other issues.

15      In sum, the court finds that the ALJ did not set forth clear and convincing reasons supported

16  by substantial evidence in the record for finding Plaintiff's statements concerning her pain and

17  symptom limitations to be less than credible. Therefore, the ALJ erred. For this additional reason,

18  the matter should be remanded.

19                                  **IV. RECOMMENDATION**

20      **IT IS HEREBY RECOMMENDED** that Plaintiff's motion (ECF No. 15) be

21  **GRANTED**; that the Commissioner's cross-motion (ECF No. 20) be **DENIED**; and that the

22  matter be **REMANDED** to the ALJ for further proceedings consistent with this Report and

23  Recommendation.

24  ///

25  ///

26  ///

27  ///

28  ///

1    The parties should be aware of the following:

2    1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local

3    Rules of Practice, specific written objections to this Report and Recommendation within fourteen

4    days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and

5    Recommendation" and should be accompanied by points and authorities for consideration by the

6    District Court.

7    2. That this Report and Recommendation is not an appealable order and that any notice of

8    appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

9    until entry of the District Court's judgment.

10

DATED: January 9, 2017.

11

12    _____
      WILLIAM G. COBB
13    UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28